# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DANIEL KLEINBERG, TOMER HERZOG, SATURN PARTNERS LIMITED PARTNERSHIP II, and RAKIA INFRASTRUCTURES LTD., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 12719-VCL |
| REFAEL AHARON, BOAZ COHEN, and BARUCH DILL, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| APPLIED CLEANTECH, INC., a Delaware Corporation, | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: January 27, 2017
Date Decided: February 13, 2017

Ryan P. Newell, Lauren P. DeLuca, CONNOLLY GALLAGHER LLP, Wilmington, Delaware; Amnon Shiboleth, Charles B. Manuel, Jr., Daniel S. Goldstein, Daniel J. Friedman, SHIBOLETH LLP, New York, New York. *Counsel for Plaintiffs Daniel Kleinberg, Tomer Herzog, Saturn Partners Limited Partnership II, and Rakia Infrastructures Ltd.*

Refeal Aharon, *pro se.*

Boaz Cohen, *pro se*.

Baruch Dill, *pro se.*

**LASTER, Vice Chancellor**

A voting agreement binds the stockholders of Applied Cleantech, Inc. (the "Company"). The stockholders committed to a board of directors with six seats. The agreement gives defendant Refael Aharon, who is the founder and CEO of the Company, the practical ability to fill three seats.

Historically, Aharon only filled two seats. In summer 2016, Aharon feared that a 3-2 majority had formed against him, so he filled his third seat with his brother-in-law. During a meeting on August 22, 2016, the board split 3-3 on a series of critical issues.

The plaintiffs sought a custodian to break the board-level deadlock. This post-trial decision grants their request.

## I.     FACTUAL BACKGROUND

Trial took place on January 26-27, 2017. Aharon and two other witnesses testified live. Aharon proceeded *pro se*, and he frequently attempted to make affirmative statements when questioning other witnesses. The defendants agreed to treat Aharon's affirmative statements as part of his testimony. They also agreed that the record encompassed both the exhibits presented at trial and materials Aharon previously filed with the court. The following facts were proven by a preponderance of the evidence.

### A.     The Company's Origins

Aharon is a brilliant scientist and inventor who holds a doctorate from the Weizmann Institute of Science in Rehovot, Israel. Approximately a decade ago, Aharon perceived that urban sewage contained harvestable resources, ranging from cellulose that could be used in recycled paper products to particles of precious metals like gold, silver, and bronze. *See* Dkt. 9, App. 1; Tr. 10-11 (Lafferty); Tr. 261-62 (Aharon). Aharon raised

1

start-up capital from angel investors, including defendant Baruch Dill, and formed an Israeli company called SePage Ltd. He registered patents on his sewage-processing technology and developed a prototype for a machine that extracted cellulose from sewage. *See* Dkt. 9 at 2; Tr. 261 (Aharon).

In 2007, Aharon turned to Saturn Partners, a venture capital firm based in Boston, Massachusetts. Saturn liked the sewage-processing technology and agreed to invest $2.5 million. In May 2007, to facilitate the investment, the parties formed the Company as a Delaware corporation. They caused the Company to formed a wholly owned Israeli subsidiary, called Applied Cleantech (Israel) Ltd., to serve as the operating entity. To avoid confusion, this decision refers to the Israeli company as the "Subsidiary."

In return for its investment, Saturn received shares of Series A preferred stock in the Company. The shares originally represented approximately 25% of the equity, but they carried additional preferences that included anti-dilution adjustments and the right to vote on an as-converted basis. Because of problems with the Company's books and records, it is not clear how much of the equity or voting power Saturn holds today.

The parties also entered into an initial version of the voting agreement that contemplated a five-member board. It gave Aharon the right to appoint one director, the investors in SePage the right to appoint two directors, and Saturn the right to appoint two directors. As a practical matter, Aharon appointed the two SePage directors. PTO ¶ 3. He made himself a director and filled another seat with Dill. The third seat remained vacant.

Saturn filed its seats with two of its partners: Jeff McCormick and Ed Lafferty. McCormick had sponsored the investment within Saturn. Lafferty joined in a secondary, monitoring role. Tr. 9 (Lafferty).

**B.     The Company's Efforts At Commercialization**

After the Saturn investment, the Company tried to commercialize its sewer-processing technology. By all accounts, the technology was revolutionary, and it regularly attracted the interest of potential partners. Media accounts praised the technology and hailed Aharon as an international expert on water issues. *See, e.g.*, Dkt. 9, Apps. 1-3.

Unfortunately, Aharon's success as an inventor did not translate into success as a businessman. Although the trial did not focus in detail on the Company's early efforts, it appears that by 2010, the Company had used up the capital it obtained from Saturn. Around this time, Lafferty told Aharon that Saturn had written off its investment in the Company. Tr. 79 (Lafferty). He also told Aharon that Saturn was likely to be less involved in the Company's affairs going forward. *See* Dkt. 9 at 27.

To keep the Company alive, Aharon raised approximately $1.5 million from family and friends. *See id.* at 5; Tr. 269 (Aharon). The funds kept the Company going until 2013, when Aharon needed more capital. In March, Aharon and his wife sold their home and invested the proceeds in the Company. Dkt. 9 at 27; Tr. 269 (Aharon).

In May 2013, the Company gained a new lease on life when plaintiffs Daniel Kleinberg and Tomer Herzog invested approximately $2.5 million in the Company. Tr. 269 (Aharon). Kleinberg and Herzog had founded a technology company in 2002, which

3

they sold for $115 million in 2011. Tr. 169-70 (Kleinberg). That transaction is the subject of unrelated litigation in this court. *See* Tr. 251-57 (Aharon & Kleinberg); Dkt. 9, App. 25.

In return for their investment, Kleinberg and Herzog received Series B preferred stock representing approximately 35% of the Company's equity. The voting agreement was amended to provide for a board with six seats. *See* PX 22 (the "Voting Agreement"). Kleinberg and Herzog each received the right to fill a seat, and they appointed themselves. Aharon retained the right to fill a seat, and he continued to serve. The investors in SePage continued to have the right to fill two seats, and Aharon continued to have the practical ability to fill them. PTO ¶ 3; Tr. 16 (Lafferty). Dill continued to serve, and the other seat remained vacant. Saturn's appointment rights were reduced from two directors to one, and Lafferty continued as Saturn's lone representative. *See* PX 22; Tr. 80 (Lafferty).

With the proceeds from Kleinberg and Herzog's investment, Aharon ramped up the Company's efforts to commercialize its products. For working capital, he secured a revolving line of credit from Bank Mizrahi, one of the largest banks in Israel. The Subsidiary was the borrower, and Aharon personally guaranteed the line. Tr. 270 (Aharon).

During 2014, the Company appeared to be on the verge of success. It pursued pilot projects with an impressive list of potential partners, including Waterschap Aa en Maas, a government-sponsored utility in Holland; Scottish Water, a government-sponsored utility in Scotland; and Veolia, a major international water company headquartered in France. *See* Tr. 270, 277-79 (Aharon).

But the Company needed additional funds to pursue these projects. In February 2014, the Subsidiary obtained a loan of approximately $800,000 from Bank Mizrahi. The

4

Subsidiary only received the loan because Aharon, Kleinberg, Herzog, and non-party Assaf Morag (who appears to be a friend of Herzog's) provided personal guarantees.

In April 2014, the Company entered into an agreement to sell one of its sewage-processing machines, but the deal required seller financing. Aharon shopped for a loan at an interest rate of 15%, but no bank would lend to the Company at that rate. Kleinberg agreed to fund the loan at the rate Aharon wanted. *See* Tr. 203-04 (Kleinberg).

In October 2014, the Company needed still more cash. With further support from Kleinberg and Herzog, the Company raised approximately $2.5 million.

Unfortunately, none of the pilot projects led to a long-term contract. The parties disagree vehemently about the reasons for the Company's lack of success. Aharon blames external factors, such as the conservative nature of decision makers in the water industry, their resistance to new technology, and their preferences for local businesses. Tr. 264-65, 267 (Aharon). The plaintiffs blame Aharon's lack of business acumen, combative nature, and poor interpersonal skills. *See* Tr. 163-67 (Aharon & Lafferty).

## C. Kleinberg And Herzog Lose Confidence In Aharon.

When Kleinberg and Herzog initially invested in the Company, they discussed with Aharon the need to bring in an experienced CEO who could take the Company to the next level. Aharon appeared supportive as long as the timing was right. Tr. 171, 207 (Kleinberg).

The Company's difficulties during 2014 caused Kleinberg and Herzog to believe that the time had come to bring in a new CEO. During 2015, Kleinberg and Herzog introduced potential candidates to the Company. Aharon resisted their efforts. Tr. 171-73, 208-14 (Kleinberg). For his part, Aharon felt betrayed. He believed that Kleinberg and

5

Herzog were attacking him personally and that they had become obsessed with replacing him. *See* Dkt. 9 at 7; Tr. 80-81 (Aharon & Lafferty); Tr. 271-72 (Aharon).

In late 2015, with the Company running out of money and no new sources of financing available, Aharon terminated all of the employees except himself. Using money that he borrowed personally and his own retirement savings, he paid the severance obligations that he believed the Company owed its employees. *See* Dkt. 9 at 7; Tr. 272 (Aharon).

**D.     The Bioform Opportunity**

With the Company on the brink of failure, an opportunity emerged that had real promise. Two years earlier, in 2013, representatives of a Canadian entity known as Canadian Sewage Mining Corporation had visited Aharon in Israel. The discussions led to a pilot project in Canada. Towards the end of 2015, Aharon and Gary McLoed, who was serving as the lead representative for Canadian Sewage Mining, worked out the terms of a joint venture to manufacture and distribute sewage-processing machines in North America. Tr. 273, 301 (Aharon).

The basic idea was for the two companies to form a new entity called BioForm Manufacturing Inc. The Company would license its technology to the new entity, which would manufacture the Company's sewage-processing machines. In return, the Company would receive 10% of the equity in the new entity. Canadian Sewage Mining would re-name itself as Bioform Sewage Mining and enter into a sales and distribution agreement with the manufacturing entity and the Company. Under the distribution agreement, the Company would receive royalties when its machines were sold. The distinction between

6

the manufacturing entity and the selling entity are not critical to this decision, which refers to both collectively as "Bioform."

Aharon asked Lafferty to help him on the Bioform deal. With the prospect of a solution to the Company's problems on the horizon, Lafferty became more involved. He conducted due diligence on the Canadian firm and its proposal, and he concluded that both were legitimate. He supported Aharon in working with Bioform's principals, primarily McLoed, and he tried to mollify Kleinberg and Herzog, who continued to press for a new CEO. *See* Tr. 77-78, 80 (Lafferty).

In December 2015, Aharon presented the board with a Non-Binding Memorandum of Understanding for the Bioform deal. Dkt. 9, App. 16 (the "Non-Binding MOU"). It outlined the terms of the partnership and established a timetable for drafting definitive documents. The Non-Binding MOU contemplated that Aharon would relocate to Canada in March 2016 and would devote 85% of his time to working with Bioform for a period of two years. It also contemplated that Aharon's family would follow him to Canada later in 2016. Aharon told the board that Bioform wanted him in Canada to help with transitioning the technology and starting up the manufacturing process. Tr. 20 (Lafferty). During a meeting in December 2015, the five-member board voted unanimously to approve the Non-Binding MOU. *See* DX 2.

Initially, Aharon was the Company's sole negotiator for purposes of preparing the definitive documents. By February 2016, after two trips to Canada and extensive discussions, Aharon had what he believed was an executable set of agreements. He emailed

7

the Company's other directors a package of documents and asked them to respond by email with their approval.

Kleinberg and Herzog did not believe they knew enough about the Bioform deal to approve the agreements. They felt they had not received any meaningful information about the transaction since December 2015, and they refused to approve the agreements without a board meeting. Tr. 215-17 (Kleinberg). They also continued to believe that the Company needed a new CEO. Tr. 206-07 (Kleinberg). Lafferty disagreed. He was convinced that the Company needed to focus on the Bioform deal, and he believed that Aharon was critical to making that transaction work. He also believed that once the deal was in place, Aharon naturally would assume a greater role with Bioform, making it easier to bring in a new CEO for the Company. *See* Dkt. 9, Apps. 10 & 20; Tr. 61 (Lafferty); Tr. 219-21 (Kleinberg).

On February 22, 2016, the board met to consider the Bioform agreements. Herzog was not present. He tried to deputize Morag in his place, and Morag purported to act as a director at the meeting. Tr. 65 (Lafferty). As a matter of Delaware law, a director cannot act by proxy. *In re Acadia Dairies, Inc.*, 135 A. 846, 847 (Del. Ch. 1927) (Wolcott, C.). This decision therefore ignores Morag's participation.

When the Bioform transaction initially was presented, Kleinberg opposed it. After discussion, Kleinberg agreed to abstain. Lafferty, Dill, and Aharon voted in favor. The minutes recounted these events. *See* PX 5.

After the February 2016 meeting, Aharon sent a copy of the minutes to Bioform to satisfy the Company's representation that the transaction was duly authorized. Tr. 67

8

(Lafferty). But Bioform was concerned about the lack of a unanimous vote. Two other Bioform representatives, Sean Ross and Jean Navert, reached out to Lafferty. They raised a host of concerns and sought improved terms in light of what they perceived to be greater uncertainty about the deal. *See* Tr. 74-76 (Lafferty); Tr. 274 (Aharon). Prompted by this outreach, Lafferty became more directly involved in the negotiations between the Company and Bioform. Tr. 274 (Aharon).

Lafferty also became more involved because he was uncomfortable with the language of the documents that Aharon had negotiated. Aharon had not used a lawyer, and Lafferty did not think anyone with legal training would approve the language. *See* Tr. 39, 66 (Laffterty).

Lafferty caused Saturn to pay for a lawyer from Mintz Levin Cohn Ferris Glovsky & Popeo PC to review and revise the agreements for the Company. Mintz Levin already represented the Company on patent matters, so they were a natural choice. Aharon sent Lafferty an email approving of the Mintz Levin lawyer who did the work. *See* Tr. 39-40, 73, 103 (Lafferty).

In March 2016, Ross replaced McLoed as the lead representative on the transaction for Bioform. Ross found working with Aharon to be extremely challenging. As the relationship between Ross and Aharon deteriorated, Ross began reaching out to Lafferty in lieu of dealing with Aharon.

As Ross and Lafferty began communicating more frequently, Aharon grew suspicious that they were conspiring against him. He felt that as the Company's CEO, he should be the exclusive point of contact for the Company. He began to fear that Lafferty

and Ross were designing terms for the agreements that the Company could never fulfill. He suspected that they wanted to the Company to go bankrupt so that Bioform and Saturn could secure the Company's technology and proceed on their own. Tr. 263, 284, 296, 302 (Aharon).

Aharon's fears escalated when he saw the terms of the revised agreements that Ross and Lafferty were negotiating with the help of Mintz Levin. In one version, Ross marked up the agreement with provisions that sought to secure Bioform's rights to use the Company's technology under any circumstances, including if the Company declared bankruptcy. Lafferty pushed back on these terms. Tr. 104 (Lafferty). Nevertheless, their inclusion was enough to validate Aharon's suspicions. *See* Tr. 86-89, 104 (Aharon & Lafferty). Aharon also inferred that Mintz Levin was really working for Lafferty. *See* Dkt. 9 at 27 ("Ed Lafferty and the lawyer prepared the company for bankruptcy."); *id.*, App. 20 (making accusations against Lafferty); Tr. 102 (Aharon: "It wasn't a company attorney. It was an attorney representing Ed.").

The evidence presented at trial convinced me that Aharon's fears were unfounded. Bioform made a reasonable ask by seeking to protect its right to use the technology, Lafferty responded appropriately. The evidence also convinced me that Lafferty sought throughout to keep the deal on track. He attempted to mediate between Ross and Aharon and brought his considerable experience to bear on the Company's behalf.

E.    The May 2016 Meeting

10

By May 2016, Lafferty, Ross, and Mintz Levin had prepared an executable set of documents. They succeeded in spite of Aharon as much as because of him. During this period, the strange brew of Aharon's suspicions became more toxic.

Recall that in February 2016 when Bioform was dissatisfied with the Company's approval of the deal, Lafferty asked Mintz Levin to prepare a set of resolutions that would be acceptable to Bioform. On May 13, 2016, Mintz Levin circulated draft minutes that included resolutions. *See* Dkt. 9, App. 19. As is customary, the resolutions contained a general provision authorizing the Company's officers to take the actions necessary to implement the transaction. The draft minutes also designated Lafferty to serve as the secretary of the meeting and as the individual who would sign the minutes. *Id.*; *see* Tr. 106-07 (Lafferty).

Aharon was outraged. He held the official position of Company secretary, and he did not understand the concept of appointing a different individual as the secretary for the meeting. Aharon inferred that Lafferty was trying to usurp his office and assert broad powers over the Bioform deal. *See* Dkt. 9 at 28 ("Ed forged corporate documents and tried to change resolutions in his favor."); PX 2 ("Ed was never appointed as the company secretary – Falsifying cooperate [sic] documents is a criminal act . . . ."); Tr. 105-06 (Aharon: "In this document, Ed takes in initial decision and tries to apply to himself the responsibilities of an officer for Applied Cleantech."); Tr. 275 (Aharon: "Ed has presented himself as the secretary and . . . tried to get authorities that he never got."). The evidence causes me to reject this unconventional interpretation.

11

Despite Aharon's pique, the board went forward with a meeting on May 22, 2016. During the meeting, the directors approved a manufacturing and license agreement and a distribution agreement. The deal contemplated that Aharon would enter into a separate services agreement with Bioform.

## F.      The Bioform Deal Falls Apart.

Soon after the May 2016 meeting, the newly-inked Bioform deal to begin to unravel. Under the agreements, the Company had an obligation to use its good faith efforts to transfer its technology to Bioform. Tr. 19-20, 32 (Lafferty). Ross asked Aharon to begin transferring the Company's technology. Aharon refused. He felt that Bioform was not living up to its obligations to pay his expenses and help with his immigration issues, and he was not going to transfer any data until those issues were addressed. *Id.*; Tr. 304 (Aharon).

Lafferty tried to mediate by proposing that the Company start providing Bioform with some data as a show of good faith. Tr. 20 (Lafferty). Aharon interpreted Lafferty's proposal as further confirmation that Lafferty had allied with Bioform.

To justify delaying the transfer, Aharon changed his story about what it would require. Earlier he had told Lafferty that the data could be transferred on a thumb drive. Now he said it would take approximately four weeks and three full-time engineers. *See* Dkt. 9, App. 20. At trial, he testified that "the majority of the material" was in his head. Tr. 288-89 (Aharon).

During early June 2016, after a series of increasingly accusatory emails and telephone calls, the relationship between Aharon and Ross ruptured. *See* PX 12; PX 13;

12

DX 19. On June 15, 2016, without first calling a board meeting or obtaining board approval, Aharon told Ross that Bioform was in default under its contracts with the Company and with Aharon personally. On June 22, 2016, still without convening a board meeting or obtaining board approval, Aharon told Ross that Bioform had thirty days to cure its breaches or the Bioform deal would be terminated.

On June 27, 2016, Ross instructed Aharon to direct all further communications to Bioform's legal counsel. On June 28, Bioform's counsel gave Aharon notice that Bioform regarded the Company as having repudiated their agreements. On July 4, still without convening a board meeting or obtaining board approval, Aharon had an Israeli lawyer send a formal notice of default to Bioform.

By letter dated July 20, 2016, Bioform wrote the Company's directors. Among other things, Bioform stated that it had not insisted on Aharon coming to Canada. Rather, that had been a condition that Aharon imposed:

> From the beginning, Dr. Aharon made it abundantly clear that it was a package deal, if we were going to manufacture, he and his family would come to Canada. We never "invited" him to come, but, we saw value in having the man behind the technology assist us in embarking on the manufacturing venture. For this reason, we agreed to his request for a Services Agreement with us to run in parallel to the Manufacturing Agreement. Despite our repeated suggestions and requests that Dr. Aharon have legal counsel on his side during the negotiations, he chose to try and do it himself, which directly caused a significant delay in executing the agreements. We were fully prepared to sign off on the agreements in February 2016, however Dr. Aharon's unilateral actions and resistance to provide supporting documentation led to significant delays.

PX 10.

Bioform's letter detailed numerous other problems that they believed Aharon had caused. Bioform concluded:

> [W]e remain committed to the [Company's] technology. . . . If there is an opportunity to avoid a legal solution to this matter, we would be more than willing to discuss it. At this point, we will only entertain solutions that include a change in the corporate control of [the Company] as it is more than evident the current dysfunctional situation is not conducive to sound business decisions. Dr. Aharon's latest apparent manipulation of the directors by adding a family member only proves this point.

*Id.*

## G.      Aharon Creates A Deadlock.

When Aharon sent Bioform the termination letter dated June 15, 2016, he provided a copy to Lafferty. Before receiving his copy, Lafferty did not know Aharon was planning to terminate the agreement. After receiving it, Lafferty asked Aharon to call an emergency board meeting to brief the directors. Lafferty suggested meeting on June 27th or 28th. *See* Tr. 22-23 (Lafferty); Tr. 275 (Aharon). Aharon told Lafferty that his doctor had diagnosed him as suffering from extreme work-related stress and directed him not to work for a period of two weeks. He told Lafferty that any board meeting would have to take place after his respite and should be scheduled for late July. *See* Tr. 23, 137 (Lafferty).

During the weeks when Aharon ostensibly was precluded from working on medical grounds, he exchanged multiple communications with Bioform in which he accused Bioform of breaching its agreements with the Company. From time to time, Ross copied Lafferty on his email exchanges with Aharon, so Lafferty had periodic glimpses into what was going on.

14

Throughout July 2016, Lafferty, Herzog, and Kleinberg pressed Aharon to hold a meeting. During these exchanges, Herzog proposed having Aharon resign as CEO and continuing as the Company's Chief Technology Officer. Aharon volubly refused. Dkt. 9, Apps. 14-15.

After Bioform sent its termination letter dated July 20, 2016, Lafferty again demanded that Aharon schedule an emergency board meeting. Aharon responded that "no board meeting was necessary." Tr. 34 (Lafferty). He told Lafferty that "[h]e would respond, because he has the authority [as CEO]." *Id.*

Aharon resisted holding a board meeting because he feared that Lafferty had joined forces with Kleinberg and Herzog. Aharon viewed Lafferty as the swing vote between Dill and himself, on the one side, and Kleinberg and Herzog, on the other. *See* Tr. 82 (Aharon). Lafferty historically had supported Aharon in pursuing the Bioform deal. Aharon sensed that Lafferty had lost confidence in him and would side with Kleinberg and Herzog to form a 3-2 board majority that could remove him and take other actions contrary to his wishes. Tr. 19-20 (Lafferty); Tr. 276, 280-82, 312 (Aharon).

To address this threat, Aharon filled SePage's second seat with his brother-in-law, defendant Boaz Cohen. Dkt. 9 at 10. As Aharon described it, "[t]his created a 3:3 tie vote and the act that they planned was temporarily stopped." *Id.* He filled the seat "in order to prevent a takeover and minority abuse by Ed Lafferty, Tomer Herzog and Daniel Kleinberg." *Id.* at 12. At trial, he testified that Lafferty wanted a "board decision very fast . . . because they were five then." Tr. 281 (Aharon). He explained that "they didn't succeed

15

[in] doing so because I used my right to appoint a sixth member." *Id.* From that point on, there was a deadlock at the board level. *See* Tr. 186-87 (Kleinberg).

## H.      The Bank Mizrahi Proceedings

After Aharon filled the third vacancy, he scheduled a board meeting for August 16, 2016. Aharon advised that during the meeting, he intended to raise the possibility of removing Lafferty from the board for cause due to his alleged breaches of fiduciary duty, fraud, and conflict of interest. That meeting was postponed when Bank Mizrahi sued Aharon on two personal guarantees he had signed for Company debts. Aharon believed that Kleinberg, Herzog, and Morag bribed the bank to sue him. Tr. 123-24, 128 (Aharon).

Recall that in February 2013, Aharon, Kleinberg, Herzog, and Morag had signed personal guarantees to secure the loan of $800,000 that Bank Mizrahi extended to the Subsidiary. Three years later, the loan was in default, and the bank was threatening legal action. Tr. 232 (Kleinberg).

In May 2016, Kleinberg, Herzog, and Morag negotiated an agreement with Bank Mizrahi to address their personal exposure (the "Guarantor Agreement"). It called for them to (i) pay their proportionate share of the loan and (ii) place funds equal to Aharon's share in escrow with the bank. In return, the bank would not pursue legal action against them and would use its best efforts to recover Aharon's share from him before levying on the escrow.

Kleinberg explained that he did not want to pay Aharon's share if he did not have to. In May 2016, when the Guarantee Agreement was negotiated, the Bioform deal was getting off the ground, and Aharon seemed to be employed successfully in Canada.

16

Kleinberg thought Aharon should pay his share and was simply trying to make others cover his debt. Tr. 232-33, 236-37 (Kleinberg).

After negotiating the Guarantor Agreement, the bank provided a copy to Aharon so he could make arrangements for payment. Aharon told the bank that he did not have any money. In light of the promising Bioform deal, Kleinberg, Herzog, and Morag convinced the bank to delay its collection efforts. Tr. 236-37 (Kleinberg). By July 2016, the Bioform deal had fallen apart, and the bank would not wait any longer.

Bank Mizrahi sued Aharon both for his share of the loan that remained unsatisfied after the payments made under the Guarantor Agreement and on the personal guarantee that he signed to secure the Company's revolving line of credit. The bank took advantage of a procedure analogous to the common law practice of a confession of judgment. Tr. 243-44, 248-51 (Aharon).

## I. The Vertenergy Relationship

While the Canadian venture was falling apart and the board was splitting into warring factions, the Company's only other commercial relationship descended into crisis. In February 2013, the Company entered into a distribution agreement with Vertenergy, a water treatment company in Mexico. In January 2015, the Company entered into a sales agreement with Vertenergy. In the early months of 2016, Vertenergy told the Company that it had a pipeline of ten opportunities stretching from July 2016 through February 2017, including wastewater treatment plants in Mexico City, Panama, and Cabo San Lucas.

Under the agreement with Vertenergy, the Company had an obligation to fund repairs to a demonstration unit that remained under warranty. In an email dated July 18,

17

2016, a Vertenergy employee asked Aharon to pay approximately $2,193 for repairs that Aharon previously authorized. PX 8. Aharon initially ignored the email, then told Vertenegy to deduct the expenses from the new orders that they were projecting. *Id.* When the Vertenergy employee asked for payment to avoid mixing new orders with old expenses, Aharon purported to terminate the Company's agreements with Vertenergy. He wrote:

> The minimum sales was [sic] delayed once to allow you to initiate sales, without having this we cannot proceed with Vert as our partners or distributor. I will speak with Fernando [Delgado, the head of the project at Vertenergy] to finalize the termination of our relationships due to your defaults. All financial issues will be discussed with Fernando. Detailed termination letter will follow after speaking with Fernando.

*Id.*

> Delgado was nonplussed. He reached out to his boss and to Lafferty, writing:

> It seems like Dr. Rafi Aharon is talking about terminating our agreement based on the fact that we simple sent an invoice for the 2000 euro [the Company] owes us from the Leon repairs (which Rafi approved).

> I don't see any connection between the two events. [Y]ou need to get involved.

*Id.* After learning of these developments, Lafferty renewed his calls for a board meeting and sought to add the Vertentergy relationship to the agenda.

As part of his defense in this case, Aharon asserted that the agreement with Vertenergy was cancelled upon "a joint decision with the Mexican partner and after the Mexican partner announced that he does not wish to go on." Dkt. 9 at 17. That is not accurate. Aharon terminated the agreement unilaterally, without informing the board or obtaining board approval.

**J.      The August 22 Meeting**

The board finally met on August 22, 2016. It was the first time the directors had met since May. For reasons that the parties did not address, Dill resigned from the board just before the meeting. Aharon appointed David Cohen to fill the resulting vacancy. *See* Tr. 14, 44 (Lafferty).

When the board convened, they first discussed what action to take regarding the Bioform deal. Aharon wanted the Company to sue Bioform. He already had filed a lawsuit personally against Bioform in Canada, but he did not disclose that to the board. The board split 3-3 on whether to sue Bioform. Aharon, Boaz Cohen, and David Cohen supported having the Company file a lawsuit against Bioform. Lafferty, Herzog, and Kleinberg did not want to file suit. The Company did not have the money to retain counsel, and they wanted to understand more about what had happened so they could evaluate other options, including whether to try to salvage the relationship. *See* Tr. 176-77 (Kleinberg).

The directors next discussed what action to take regarding Bank Mizrahi's suit against Aharon. Aharon and his appointees wanted the Company to sue the bank and the signatories to the Guarantee Agreement. Lafferty, Herzog, and Kleinberg viewed it as a personal matter between Aharon and Bank Mizrahi. The board would have split 3-3, but an Israeli lawyer whom Aharon brought to the meeting stated that Aharon, Herzog, and Kleinberg could not vote because they were interested in the transaction. *See* Tr. 178-80 (Kleinberg). That advice was incorrect as a matter of Delaware law. *See* 8 *Del. C.* § 144; *Feeley v. NHAOCG, LLC*, 2012 WL 4859132, at *11 (Del. Ch. Oct. 12, 2012) (discussing operation of Section 144). Nominally, the directors voted 2-1 in favor of authorizing a lawsuit, but that vote was invalid as a matter of Delaware law because Aharon, Herzog,

19

and Kleinberg were improperly foreclosed from voting. The vote also was invalid because the deliberations were conducted in Hebrew. Tr. 44 (Lafferty). Lafferty is a director, but he does not speak Hebrew. He therefore was unable to participate effectively in the meeting. *See Lippman v. Kehoe Stenograph Co.*, 95 A. 895, 899 (Del. Ch. 1915).

Lastly, Herzog sought to raise the question of CEO removal. Aharon refused to allow the issue to be discussed. At the conclusion of the meeting, Aharon stated that the Company was preparing a lawsuit against Lafferty, Herzog, and Kleinberg. Kleinberg responded that the directors had been preparing a lawsuit of their own, which was a reference to this proceeding. Lafferty explained at trial that after Aharon resisted holding a board meeting and filled the second SePage seat, they recognized that the board faced deadlock and began exploring their options. *See* Tr. 46-47 (Lafferty)

Aharon failed to raise other items of business at the meeting. For example, Lafferty, Herzog, and Kleinberg had asked for the Company's capitalization table to be presented for discussion during the meeting because they had concerns about its accuracy. Aharon did not bring the matter up for discussion.

After the meeting, the parties could not agree on a set of minutes to document what took place. Aharon circulated a set of minutes that his Israeli attorney prepared. *See* PX 2. Herzog, Kleinberg, and Lafferty disputed the accuracy of the minutes and suggested changes. *See* PX 3; Tr. 174-80, 185 (Kleinberg). Aharon refused to make any changes and asserted that "the minutes and decisions are accurate and obligatory." *Id.* They are neither. At best, they are a partial account.

K.     The Lawsuits

20

Multiple lawsuits are now pending relating to the Company and its affairs. Shortly before the board meeting on August 22, 2016, Aharon sued Bioform, Ross, McLoed, and Navert in Canada. *See* Dkt. 9, App. 6. To date, Bioform has not asserted counterclaims against Aharon or third-party claims against the Company, but Bioform has put the Company on notice that it will sue the Company if a settlement is not reached. *See* PX 4.

Also in August 2016, Aharon caused the Subsidiary to sue Kleinberg, Herzog, Lafferty, and Morag in Israel. The suit alleges that the defendants harmed the Subsidiary by taking various actions in breach of their fiduciary duties. Aharon filed a second lawsuit in Israel against the Company for breach of his employment agreement. Aharon filed a third lawsuit in Israel against Bank Mizrahi, Kleinberg, Herzog, and Morag over the Guarantee Agreement. *See* Dkt. 9, App. 4; Tr. 321-23 (Aharon).

In Mexico, Vertenergy has sued the Company over a loan that it extended to the Company as part of its distribution agreement. Tr. 324 (Aharon).

**L.     This Litigation**

On September 2, 2016, the plaintiffs filed this action. They sought the appointment of a custodian pursuant to Section 226 of the Delaware General Corporation Law, 8 *Del. C.* § 226. They also asserted a variety of claims against Aharon, Cohen, and Dill.

The plaintiffs faced a problem in serving process: the Company's account with its registered agent had become inactive for non-payment. The plaintiffs brought the account current to facilitate service. Tr. 130-32 (Aharon).

Aharon perceives profound injustice in reactivating the Company's account with its registered agent. I do not. Had the plaintiffs not brought the account current, they could

have served the Company and the defendants through the Delaware Secretary of State. *See* 8 *Del. C.* §§ 136(c), 321; 10 *Del. C.* § 3114. After a more cumbersome procedure, the parties would have reached the same endpoint.

Using the Company's registered agent to effect service also made sense because the plaintiffs did not know where Aharon was. He subsequently provided the court with the following cryptic description of his whereabouts: "I have no permanent address. I have a traveling bag, wife, and four small kids with me . . . . I [am] not near Delaware, but I do have [an intention] to arrive to the trial on 26-7, January . . . ." PX 16. At trial, he testified that he and his family had been traveling around the United States in a recreational vehicle. He stated that he is currently living in Los Angeles in an apartment procured through AirBnB.com, but he did not know his address. Tr. 326, 331-32 (Aharon).

Regardless, the plaintiffs not only served the defendants through the Company's registered agent. They also ensured that the defendants received copies of the pleadings personally. Tr. 132-33 (Lafferty). The court later took additional steps to ensure that filings reached the defendants. *See* Dkts. 29, 34.

In November 2016, the plaintiffs moved to expedite their action. The court expedited only the portion of the action that sought the appointment of a custodian. Trial was scheduled and held on January 26-27, 2017. Aharon requested a translator because his primary language is Hebrew. Although Aharon was not entitled to a translator as a matter of law, this court exercised its discretion to provide him with one. *See* Dkt. 39.

## II.    LEGAL ANALYSIS

"Section 226 of the Delaware General Corporation Law authorizes any stockholder to initiate a proceeding in the Court of Chancery to secure the appointment of a custodian." Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 8.09[a], at 8-202 (2012). Under Section 226(a)(2), the court may appoint a custodian when:

> The business of the corporation is suffering or is threatened with irreparable injury because the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained and the stockholders are unable to terminate this division[.]

8 *Del. C.* § 226(a)(2).

"Section 226(a)(2) sets forth three conditions before this Court may exercise its authority under the statute." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *26 (Del. Ch. Aug. 13, 2015) (appeal pending). "First, the directors must be deadlocked; that is, they must be 'so divided respecting the management of the affairs of the corporation that the vote required for curative action by the board as a governing body cannot be obtained.'" *Id.* (quoting *Hoban v. Dardanella Elec. Corp.*, 1984 WL 8221, at *1 (Del. Ch. June 12, 1984)). Second, "the business of the corporation must either be suffering or threatened with irreparable injury because of the deadlock." *Hoban*, 1984 WL 8221, at *1. Third, the shareholders must be "unable by shareholder vote to terminate the division between the directors." *Id.*

Even when the factors are met, "[t]here is no right to the appointment of a custodian . . . ." *Miller v. Miller*, 2009 WL 554920, at *4 (Del. Ch. Feb. 10, 2009). "The decision to

23

appoint a custodian is a matter of the court's discretion." 1 Edward P. Welch et al., *Folk on the Delaware General Corporation Law* § 226.01, at 7-308 (6th ed. 2015).

Each of the requirements for a custodian is met in this case. Equally important, a custodian is warranted under the circumstances presented.

## A.    Deadlock

By statute, deadlock exists when "the directors are so divided respecting the management of the affairs of the corporation that the required vote for action by the board of directors cannot be obtained." 8 *Del. C.* § 226(a). The deadlock must be a product of "genuine, good faith divisions." *Shawe*, 2015 WL 4874733, at *28. A court will not recognize a deadlock if one side sought to manufacture it "by refusing to consider any issue." *Millien v. Popescu*, 2014 WL 656651, at *2 n.17 (Feb. 19, 2014). Nor will a court recognize a deadlock "based upon a specious premise." *Francotyp-Postalia AG & Co. v. On Target Tech., Inc.*, 1998 WL 928382, at *4 (Del. Ch. Dec. 24, 1998).

The Company's board is plainly deadlocked. Aharon created the deadlock in July 2016 when he appointed a third director to stop the emergent board majority of Lafferty, Kleinberg, and Herzog from taking action against him. The events during the board meeting on August 22, 2016, confirmed the deadlock. The board split 3-3 on critical issues such as what to do about the Bioform transaction and the Bank Mizrahi lawsuit. Aharon did not permit any discussion or vote on important issues like CEO removal, the capitalization table, or the Vertenergy deal.

Aharon contends that the plaintiffs manufactured the deadlock in bad faith. He observes that "[u]ntil March 2016, all company resolutions were unanimous." Dkt. 9 at 12.

24

He also observes that "[u]ntil July 2016, Ed Lafferty always supported and voted with the CEO and the founders' group." *Id.* Accepting both assertions as true, that does not mean that the deadlock was manufactured. The record establishes that Herzog and Kleinberg lost confidence in Aharon in 2015. They would have sought to replace Aharon before the Bioform deal if Lafferty had not persuaded them otherwise. The course of the Bioform deal caused Lafferty to lose confidence in Aharon and agree with Herzog and Kleinberg on the need for change. The deadlock is the result of legitimate disagreements about the direction of the Company and Aharon's role.

Aharon also has claimed that the plaintiffs are trying to steal the Company's technology. Tr. 263, 284, 296 (Aharon). He argued in particular that Lafferty breached his fiduciary duties by conspiring with Bioform and Mintz Levin during the negotiation of the Bioform deal to design terms that the Company never could meet so as to force the Company into bankruptcy and acquire its technology. Tr. 359 (Aharon). Those assertions are unpersuasive and border on irrational. Lafferty testified credibly at trial that he wanted the Bioform deal to succeed because he viewed it as the Company's only hope. From my review of the record, he acted properly in trying to secure the Bioform deal for the Company.

Relatedly, Aharon has asserted that the plaintiffs' non-Delaware counsel is representing them in this matter because they want to steal the Company's technology. He testified that in 2012, Amnon Shibboleth, who is the founder and managing partner of the plaintiffs' forwarding counsel, conducted due diligence regarding a potential investment in the Company. He believes that the Shibboleth firm has a disqualifying conflict of interest

25

because of their improper motives. Tr. 367-68 (Aharon). Other than Aharon's speculative testimony, there was no evidence to support this conspiratorial allegation.

Aharon also has claimed that the plaintiffs acted in bad faith because of personal animus against him, and he cites the Guarantee Agreement as evidence. I express no view as to the legality of the Guarantee Agreement under Israeli law, which is an issue Aharon is contesting in the Israeli courts. Tr. 244 (Aharon). As a matter of Delaware commercial and fiduciary law, it does not seem problematic to me for individuals who face personal liability on a guarantee to settle with the lender, to pay their proportionate share, to place the balance in escrow, and to ask the bank to use reasonable efforts to pursue the remaining guarantor before levying on the escrowed funds. In such an agreement, the bank commits to do what it could do of its own volition in any event, and the bank undertakes to use its reasonable efforts as part of a compromise that results in the bank gaining the prospect of full payment on the loan. The fact that Israel has a procedure analogous to the common law practice of confession of judgment does not, in my view, suggest bad faith when the bank is enforcing its rights under a commercial agreement.

Aharon's arguments against a legitimate deadlock hold no water. Ironically, despite asserting that "[t]here is no need to appoint a trustee," Aharon has argued that "[w]hat is necessary is double power to the president in the event of a tie vote or, alternatively, the directors must be removed from the company due to their actions." Dkt. 9 at 22. He thus implicitly recognizes that a deadlock exists.

## B.     Harm To The Business

The second statutory requirement is a threat of irreparable harm because of the divisions between the directors. "[T]he threat of insolvency is sufficient to raise a possibility of irreparable harm." *Balch Hill P'rs, L.P. v. Shocking Techs., Inc.*, 2013 WL 588964, at *4 (Del. Ch. Feb. 7, 2013). The necessary harm also can result from damage to "a corporation's reputation, goodwill, customer relationships, and employee morale." *Shawe*, 2015 WL 4874733, at *28 (collecting cases).

The Company already has suffered substantial harm from the deadlock, and the extent of that harm will compound until the deadlock is resolved. Due to the deadlock, the board has not been able to address the Bioform situation. The Company similarly has been unable to take action regarding the situation with Vertenergy. Contrary to Aharon's view, it is the Company's board, not the Company's CEO, that has the power and responsibility to address these issues. 8 *Del. C.* § 141(a).

> The General Corporation Law of the State of Delaware . . . and the decisions of [the Delaware Supreme] Court have repeatedly recognized the fundamental principle that the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders.

*Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 41–42 (Del. 1994). "A chief executive officer . . . may not act in a manner contrary to the express desires of the board of directors." *In re Walt Disney Co. Deriv. Litig.*, 907 A.2d 693, 775 n.570 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

More broadly, the deadlock prevents the board from resolving a fundamental disagreement over the direction of the Company and who should be its CEO. "Often it is

said that a board's most important task is to hire, monitor, and fire the CEO." *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at \*15 (Del. Ch. Nov. 7, 2013) (collecting authorities). Kleinberg, Herzog, and Lafferty believe the Company should retain a new CEO, raise capital, and attempt to salvage the Bioform deal. I am convinced that Aharon will not voluntarily relinquish the reins as CEO. He identifies too strongly with the Company he founded. Boaz Cohen, Aharon's brother-in-law, strongly supports Aharon. David Cohen inferably does as well, because he joined the board days before the August 22 meeting and voted in lockstep with Aharon and Boaz Cohen. Moreover, Aharon has the ability to control whether the Cohens keep their seats, and if he perceived either of them to be faltering, I believe he would replace them immediately with someone loyal to his cause. Until the deadlock is resolved, the Company will lack captain, heading, keel, and rudder.

Insolvency is also a factor. It seems highly likely that the Company is presently insolvent on a cash-flow basis and is only potentially solvent on a balance-sheet basis if significant contingent value is placed on the risk-adjusted possibility of realizing value through a new business plan. *See* Tr. 48 (Lafferty); Tr. 352 (Aharon). Unless the deadlock is broken, the Company has no chance of pursuing a new business plan and will become irretrievably insolvent. The Company has suffered and will continue to suffer irreparable harm absent the appointment of a custodian.

### C. The Inability Of The Stockholders To Break The Deadlock

The final statutory requirement is that the stockholders must be incapable of breaking the deadlock by themselves. *Hoban*, 1984 WL 8221, at \*1. "This may well be the most limiting restriction of all for purposes of Section 226(a)(2), for a director deadlock

case in which curative stockholder action is not possible arises only rarely." Wolfe & Pittenger, *supra*, § 8.09[c][2], at 8-212. In this case, the stockholders cannot break the deadlock because of the Voting Agreement and the rights it confers, which lock the two competing factions into a 3-3 impasse.

## D.     A Custodian With Limited Powers Is Warranted.

The appointment of a custodian pursuant to Section 226(a)(2) is not mandatory. *Shawe*, 2015 WL 4874733, at *30. A custodian appointed under Section 226 shall "continue the business of the corporation and not . . . liquidate its affairs and distribute its assets, except when the Court shall otherwise order." 8 *Del. C.* § 226(b). "[T]the notion of remedying an 'injustice' informs the Court's discretion, first, whether to appoint a custodian and, second, in establishing the scope of such custodian's authority. Deadlock, itself, is not an injustice. The consequences of that deadlock for the stockholders and the enterprise must be assessed." *Miller*, 2009 WL 554920, at *5 n.19.

One option would be to decline to appoint a custodian and leave the parties to their own devices. That would be unjust. The Company is in a state of utter dysfunction that has caused the business to suffer and threatens irreparable harm.

At the other end of the spectrum, the court could appoint a custodian to sell the Company or its assets. In this case, a sale would do more harm than good. The Company has still cutting-edge technology, and in 2014 Grant Thornton LLP valued it at $60 million. *See* PX 25; Tr. 11-13, 101 (Lafferty). At this point, however, the Company's affairs are in such disarray that a sale of the technology would likely generate only a fraction of its potential value.

29

The best route is to appoint a custodian with the power to vote as a seventh director and the authority to take additional steps to resolve the deadlock. Under some circumstances, this course of action could "enmesh an outsider, and by extension, the Court into matters of internal corporate governance for an extensive period of time." *Shawe*, 2015 WL 4874733, at *30. In this case, however, a board majority could take action to move the Company forward and potentially resolve the current deadlock at the stockholder level. One path would be for the custodian to assist the board in developing a new business plan and raising capital by issuing additional equity against it. The new investors could well be in a position to change the balance of power at the stockholder level, which in turn would enable the stockholders to resolve the deadlock at the board level.

The custodian will have all of the powers of a director under the Company's certificate of incorporation and bylaws. In addition, and notwithstanding anything to the contrary in the certificate of incorporation or bylaws, the custodian shall have the following powers:

- The custodian shall have the power to call and set the date and time for meetings of the board.

- The custodian shall preside over any board meeting at which the custodian is present.

- As the presiding officer for purposes of the meeting, the custodian shall set the agenda for the meeting and oversee the discussion. The custodian may set time limits for discussion and will determine whether to call for a vote.

- A quorum shall exist for a meeting of the board if the custodian and at least three directors are present.

- The custodian shall be responsible for documenting the actions taken by the board. In the event of a disagreement over what took place during a meeting, the custodian shall document the competing positions and state his view of what occurred.

The court will appoint the custodian by separate order. It will include other provisions and address exculpation, indemnification, and advancement.

## III.    CONCLUSION

The appointment of a custodian is warranted pursuant to Section 226(a) of the Delaware General Corporation Law. Within ten calendar days, the parties shall submit (i) at least three names for the court to consider, along with their qualifications, (ii) a plan for ensuring that the Company can pay the fees and expenses of the custodian, and (iii) a proposed form of order appointing the custodian.